1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   EDWARD R. DUMBRIQUE,                    Case No.  14-cv-02598-HSG

            Plaintiff,
8                                           ORDER GRANTING IN PART AND
                                            DENYING IN PART DEFENDANTS'
9        v.                                 MOTION TO DISMISS AND FOR
                                            SUMMARY JUDGMENT; REFERRING
10  BRUNNER, et al.,                        CASE TO SETTLEMENT
                                            PROCEEDINGS; STAYING AND
            Defendants.                     ADMINISTRATIVELY CLOSING
11                                          CASE; INSTRUCTIONS TO CLERK
12
                                            Re: Dkt. No. 22
13

14

15                            **INTRODUCTION**

16          Plaintiff, a California prisoner currently incarcerated at Centinela State Prison, filed this

17  *pro se* civil rights action under 42 U.S.C. § 1983, regarding events that took place while he was

18  incarcerated at Pelican Bay State Prison ("PBSP").  Plaintiff seeks declaratory relief and nominal,

    compensatory, and punitive damages.  Docket No. 5 ("FAC") at 11.  The Court found that,
19
    liberally construed, the first amended complaint stated cognizable claims that PBSP officers
20
    Drager and Brunner retaliated against Plaintiff for engaging in hunger strikes, in violation of the
21
    First Amendment; and were deliberately indifferent to Plaintiff's safety, in violation of the Eighth
22
    Amendment.  Docket No. 6 at 2–3.  Now before the Court is Defendants' motion to dismiss and
23
    for summary judgment.  Docket No. 22.  Plaintiff has filed an opposition to the motion to dismiss
24
    and for summary judgment (Docket No. 39), and Defendants have filed a reply (Docket No. 45).
25
                              **BACKGROUND**
26
            At all times relevant to this action, Plaintiff was incarcerated in PBSP's Security Housing
27
    Unit ("SHU").
28

On July 8, 2013, Plaintiff commenced a hunger strike to protest his SHU living conditions, after his attempts to obtain relief by filing prison grievances, state habeas corpus actions, and motions in existing class action cases were unsuccessful.  FAC at 2–3.  At that time, Plaintiff was housed in Unit C3.  *Id.* at 4.  Some, but not all, of the other inmates also participated in the hunger strike.  Docket No. 39-1 at 16–17 ("Dumbrique Decl.") ¶ 2.  On July 18, 2013, Plaintiff "suspended" his hunger strike.  FAC at 4.  On August 5, 2013, Plaintiff resumed his hunger strike. *Id.*

On Thursday, August 8, 2013, Plaintiff was transferred to Unit C12.  Officers Drager and Brunner had no involvement in the decision to transfer Plaintiff.  Docket No. 24 ("Brunner Decl.") ¶ 8; Docket No. 25 ("Drager Decl.") ¶ 7.

At that time, Officer Drager was assigned to Unit C3 and his duties included assisting inmates with housing transfers.  Drager Decl. ¶ 2.  Officer Drager states that he does not recall facilitating Plaintiff's housing transfer on that date.  Drager Decl. ¶ 6.  Plaintiff recalls Officer Drager's involvement with his housing transfer as follows:  Officer Drager yelled loudly from the rotunda area of Unit C3: "Dumbrique 112, Belmudes 212, and Arredondo 211, pack up your property and get ready to move to the Debriefer Unit."  FAC at 4; Docket No. 39-1 at 1–6 ("Belmudes Decl.") ¶ 4; Docket No. 39-1 at 12–14 ("Arredondo Decl.") ¶ 3.  Plaintiff responded, "Why?  We ain't debriefers."  FAC at 4; Belmudes Decl. ¶ 4.  Officer Drager replied, "That's not what I heard, pack it up!"  FAC at 4; Belmudes Decl. ¶ 4.  Officer Drager spoke loudly enough to be heard by all the inmates housed in Unit C3.  Belmudes Decl. ¶ 4; Docket No. 39-1 at 12–14 ("Arredondo Decl.") ¶ 4.

Plaintiff alleges that a debriefer is "a prison informant or snitch who gives sensitive information to prison officials about prison gangs."  FAC at 4.  Plaintiff alleges that debriefers are targeted for assault by other inmates, and that any suggestion that an inmate is a debriefer places an inmate's life at risk.  *Id.*  Plaintiff, and fellow inmates Daniel Belmudes and Alfredo Arredondo, are not debriefers.  FAC at 4–5; Belmudes Decl. ¶ 9; Docket No. 39-1 at 8–10 ("Treglia Decl.") ¶ 3.

As part of the housing transfer, Officer Drager entered Unit C3 to pass out mail and to

unplug Plaintiff's television. Plaintiff asked Officer Drager why he had identified Plaintiff, Belmudes, and Arredondo as debriefers.  FAC at 5; Arredondo Decl. ¶ 5.  Officer Drager responded, "You guys want to play games with this hunger strike and make my job harder, I can play games too.  You guys are moving one way or another.  I suggest you either start eating or pack it up."  FAC at 5; Belmudes Decl. ¶ 5; Arredondo Decl. ¶ 5.

In accordance with Officer Drager's orders, on August 8, 2013, Plaintiff packed up his property and moved to Unit C12.  FAC at 5.  Plaintiff was housed in Section D of Unit C12, along with Arredondo and Belmudes.  Treglia Decl. ¶ 3.

Plaintiff alleges that Unit C12 is known to both correctional officers and inmates as the designated housing unit for debriefers.  FAC at 6; Belmudes Decl. ¶ 7; Treglia Decl. ¶ 2.  Defendants claim that PBSP does not have a designated housing unit where debriefing inmates are housed.  Docket No. 26 ("Olson Decl.") ¶ 6.  Defendants acknowledge that PBSP attempts to separate prison gang affiliates from debriefing inmates by housing them in different pods.  *Id.* ¶ 7.  Defendants state that during the 2013 mass inmate hunger strike, certain hunger strike participants were relocated to Unit C12 due to "institutional need."  *Id.* ¶ 9.  Unit C12 is "within close proximity to program and medical facility in [Facility] C SHU."  *Id.*  There were inmates housed in Unit C12 who did not participate in the hunger strike.  Dumbrique Decl. ¶ 2.

On August 10, 2013, Plaintiff ceased his hunger strike and resumed eating.  Docket  No. 27 ("Soderlund Decl."), Ex. A.

At that time, Officer Brunner was assigned to supervise the Unit C12 control booth as a relief officer.  Brunner Decl. ¶ 2.  This position was part-time.  Officer Brunner only worked as the Unit C12 control booth officer on Saturdays and Sundays.  *Id.* ¶ 4.  Officer Brunner's duties consisted of controlling the movement of inmates and prison staff in and out of Unit C12 by operating the switchboard, which opens and shuts the doors to Unit C12, and monitoring the activities of inmates and CDCR staff in Unit C12 though closed circuit televisions and radios.  *Id.* ¶ 2.

On Saturday, August 17, 2013, as floor officers were passing out dinner trays, Officer Brunner announced loudly to the other officers: "D Pod is where all the debriefers slash hunger

United States District Court
Northern District of California

United States District Court
Northern District of California

1  strikers are." FAC at 6; Belmudes Decl. ¶ 9; Treglia Decl. ¶ 4; Arredondo Decl. ¶ 6. Officer

2  Brunner spoke loudly enough to be heard by all inmates in adjacent pods or sections. FAC at 6;

3  Belmudes Decl. ¶ 9; Treglia Decl. ¶ 4; Arredondo Decl. ¶ 6. Officer Brunner denies making this

4  statement. Brunner Decl. ¶ 10. At that time, Plaintiff, and inmates Arredondo, Ruiz, Argumedo,

5  Treglia, and Belmudes were all housed in Section D ("D Pod") of Unit C12. Belmudes Decl. ¶ 8.

6  Information identifying the inmates housed in D Pod is posted outside D Pod and publicly visible

7  to anyone who passes by D Pod. Inmates are identified by name, CDCR number, and photograph.

8  FAC at 6.

9       The inmates housed on the bottom tier of D Pod — Antonio Ruiz, Jose Argumedo, and

10  Daniel Treglia — called out to Officer Brunner. FAC at 6; Treglia Decl. ¶ 5. When Officer

11  Brunner came to the pod window, Ruiz, Argumedo, and Treglia demanded that Officer Brunner

12  tell the inmates in the other pods that they were not debriefers and that Officer Brunner was just

13  being spiteful. FAC at 6; Belmudes Decl. ¶ 10; Treglia Decl. ¶ 6. Officer Brunner told Ruiz,

14  Argumedo, and Treglia, "Take your trays and I'll think about it." FAC at 6; Belmudes Decl. ¶ 10;

15  Treglia Decl. ¶ 5; Arredondo Decl. ¶ 7. Ruiz, Argumedo, and Treglia did not take their dinner

16  trays. FAC at 6. When the floor officers had finished picking up the dinner trays, Ruiz called to

17  Officer Brunner. FAC at 7; Treglia Decl. ¶ 6. When Officer Brunner came to the window, Ruiz

18  asked why Officer Brunner would say something like that about the inmates in D Pod. FAC at 7;

19  Belmudes Decl. ¶ 11; Treglia Decl. ¶ 6; Arredondo Decl. ¶ 8. Officer Brunner responded that "the

20  captain had all [the hunger striking inmates in Unit C12] on shit status for filing lawsuits and

21  being flip-floppers." FAC at 7; Belmudes Decl. ¶ 11; Treglia Decl. ¶ 6; Arredondo Decl. ¶ 8.

22  Officer Brunner stated that the inmates should not have agreed to move to Unit C12 because they

23  were now stuck in Unit C12. FAC at 7; Belmudes Decl. ¶ 11; Treglia Decl. ¶ 6; Arredondo Decl.

24  ¶ 8. Officer Brunner stated, "That's where you guys fucked up." FAC at 7; Belmudes Decl. ¶ 11;

25  Treglia Decl. ¶ 6; Arredondo Decl. ¶ 8.

26       Plaintiff was housed in Unit C12 from August 8, 2013 to approximately March 30, 2014,

27  when he was moved to Unit C10. Badura Decl., Ex. B. Between August 8, 2013, when Plaintiff

28  was transferred to Unit C12, to June 5, 2014, the date Plaintiff initiated the instant action, Plaintiff

1    was not involved in any altercations with other inmates.  Soderlund Decl. ¶ 6.

2           Plaintiff, Belmudes, Arredondo, Ruiz, Argumedo, and Treglia have all filed multiple

3    lawsuits in state and/or federal court protesting the conditions of their confinement.  Docket No. 1

4    at 12–13.  Plaintiff has filed the following actions protesting the conditions of his confinement:

5    ◆ *Dumbrique v. Nakamra*, C No 4:10-01197-PJH (PR), filed in the Northern District of
        California in 2010.  In this action, Plaintiff alleged that PBSP officials were deliberately
6        indifferent to his serious medical needs.

7    ◆ *In re Dumbrique*, C No. HCPB-13-5134, filed in Del Norte Superior Court.  In this action,
        Plaintiff challenged PBSP's Kosher diet program via a writ of habeas corpus.
8
9    ◆ *In re Dumbrique*, C No. HCPB-13-5136, filed in Del Norte Superior Court.  In this action,
        Plaintiff challenged PBSP's gang validation process via a writ of habeas corpus.

10   ◆ *In re Dumbrique*, C No. HCPB-13-5025, filed in Del Norte Superior Court.  In this action,
        Plaintiff challenged PBSP's medical appeals system via a writ of habeas corpus.
11
12   ◆ *In re Dumbrique*, C No. HCPB-13-5033, filed in Del Norte Superior Court.  In this action,
        Plaintiff challenged PBSP's lockdown program via a writ of habeas corpus.
13
     ◆ *In re Dumbrique*, C No. HCPB-13-5067, filed in Del Norte Superior Court.  In this action,
14       Plaintiff challenged PBSP's prohibition on correspondence via a writ of habeas corpus.

15   Docket No. 1 at 13.  Plaintiff also sought habeas relief for his criminal conviction in *In re*

16   *Dumbrique*, C No. YA-033562-02, filed in Los Angeles Superior Court.

17                                        **DISCUSSION**

18   **I.     Motion to Dismiss**

19          Defendants argue that the Court should dismiss Plaintiff's claims brought against

20   Defendants in their official capacities as barred by the Eleventh Amendment; that the Court should

21   dismiss Plaintiff's § 1983 claims because there is no allegation that Plaintiff sustained any harm as

22   a result of Defendants' alleged conduct; and that the Court should dismiss Plaintiff's retaliation

23   claims because participating in a hunger strike is not a "protected activity" within the context of a

24   First Amendment retaliation claim.  Docket No. 22 at 7.  Plaintiff does not directly address these

25   arguments in his opposition.

26          **A.     Standard of Review**

27          Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss on the

28   ground that there is a "failure to state a claim upon which relief may be granted."  Fed. R. Civ. P.

United States District Court
Northern District of California

1    12(b)(6).  A motion to dismiss should be granted if a plaintiff fails to proffer "enough facts to state

2    a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

3    (2007).  The court "must accept as true all of the factual allegations contained in the complaint,"

4    *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and must construe *pro se* pleadings liberally, *Hebbe v.*

5    *Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).  The court need not accept as true allegations that are

6    conclusory, unwarranted deductions of fact, or unreasonable inferences.  *See Sprewell v. Golden*

7    *State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended*, 275 F.3d 1187 (9th Cir. 2001).

8            **B.        Analysis**

9                    **1)        Official Capacity Claims**

10           The Eleventh Amendment to the United States Constitution bars a person from suing a

11   state in federal court without the state's consent.  *See Pennhurst State Sch. & Hosp. v. Halderman*,

12   465 U.S. 89, 98–100 (1984); *Natural Res. Def. Council v. Cal. Dep't of Transp.*, 96 F.3d 420, 421

13   (9th Cir. 1996).  The United States Supreme Court has held that state officials acting in their

14   official capacities are not "persons" under § 1983 because "a suit against a state official in his or

15   her official capacity is not a suit against the official but rather is a suit against the official's

16   office."  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  The Court concluded that

17   such a suit is therefore no different from a suit against the state itself.  *Id.*  Accordingly, the

18   Eleventh Amendment bars Plaintiff's claims for monetary relief to the extent that they are based

19   on acts engaged in by Officers Brunner and Drager in their official capacities.  *See Will*, 491 U.S.

20   at 71; *Nesbit v. Dep't of Pub. Safety*, 283 F. App'x 531, 533 (9th Cir. 2008) (concluding that the

21   district court properly dismissed prisoners' claims against defendants acting in their official

22   capacities).  Defendants' motion to dismiss Plaintiff's official-capacity claims against Defendants

23   is GRANTED, and those claims are DISMISSED with prejudice.

24                   **2)        42 U.S.C. § 1983 claims**

25           Defendants argue that Plaintiff fails to state a claim under 42 U.S.C. § 1983 because

26   Plaintiff's allegation that Defendants' actions have exposed him to the possibility of future harm is

27   insufficient to state cognizable § 1983 claims.  In support of their argument, Defendants cite an

28   unpublished disposition, *Williams v. Lopez*, No. 94-15150, 1994 WL 526200, at *2 (unpub. disp.)

United States District Court
Northern District of California

6

United States District Court
Northern District of California

(9th Cir. Sept. 27, 1994).  In *Williams*, the prisoner, who was serving a sentence for committing lewd and lascivious acts upon a child, alleged that a prison official had been deliberately indifferent to his safety when the prison official remarked: "Oh! You like children do you?"  1994 WL 526200, at *2.  The prisoner alleged that the remark would have had the effect of placing him in extreme danger if any prisoners had overheard the remark and had known of his crime.  *Id.*  The Ninth Circuit affirmed the district court's grant of summary judgment in favor of the prison official on this Eighth Amendment claim because the prisoner failed to present evidence that the remark had been heard by other prisoners or that the other prisoners would have sought to injure him.  *Id.*  The Ninth Circuit held that, under these circumstances, the remark could "only be regarded as verbal abuse and, as such, [was] not actionable."  *Id.*

The *Williams* case is inapplicable here for two reasons.

First, the standard of review for summary judgment motions differs significantly from the standard of review for motions to dismiss.  A court will grant a summary judgment motion "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In contrast, Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Erickson*, 551 U.S. at 93.  A plaintiff need only proffer enough facts to state a claim to relief that is plausible on its face.  *Bell Atlantic Corp.*, 550 U.S. at 570.  When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.  *Erickson*, 551 U.S. at 94.  In *Williams*, the Ninth Circuit affirmed the district court's grant of summary judgment because the prisoner had failed to satisfy the standard for summary judgment.  However, in evaluating the instant motion to dismiss, the Court accepts as true all of Plaintiff's allegations in the FAC and liberally construes the FAC, *Hebbe*, 627 F.3d at 342.

Second, unlike the plaintiff-prisoner in *Williams*, Plaintiff alleges that Defendants' remarks were overheard by other prisoners, and that inmates known as debriefers are targeted for assault by

7

other inmates.  While a threat or verbal abuse may be insufficient to state a constitutional violation, *see Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997), *overruled in part on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008) (verbal harassment insufficient to state constitutional deprivation under 42 U.S.C. § 1983); *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (mere threat does not constitute constitutional wrong, nor do allegations that naked threat was for purpose of denying access to courts compel contrary result), the Ninth Circuit has found that deliberately spreading a rumor that a prisoner is a "snitch" in response to a prisoner's attempt to seek redress for grievances may state a claim under 42 U.S.C. § 1983, *see Valandingham v. Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989).  Accepting as true all of the factual allegations contained in the complaint, and keeping in mind that *pro se* pleadings must be liberally construed, *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988), the Court finds that Plaintiff's claim that prison officials labeled him a debriefer in retaliation for his hunger strike states a cognizable § 1983 claim.  Defendants' motion to dismiss Plaintiff's §1983 claims for failure to state a claim is DENIED.

### 3)     Retaliation Claims

Defendants argue that Plaintiff fails to state a claim for First Amendment retaliation because a hunger strike is not "protected conduct" under the First Amendment.  *See Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (the five basic elements of a First Amendment retaliation claim in the prison context are: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.").  Plaintiff argues that his hunger strike is protected conduct because it was an extension of his constitutional right to refuse to eat, it was an extension of his liberty interest in refusing to eat, and because it was an exercise of his First Amendment right to free speech.

After reviewing the cases and statutes cited by Plaintiff, the Court finds that there is neither a constitutional right to refuse to eat nor a liberty interest in refusing to eat.

Plaintiff claims that *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990); *Washington

*v. Harper*, 494 U.S. 210 (1989); and *Vitek v. Jones*, 445 U.S. 480 (1980) establish a constitutional right to refuse to eat.  None of these cases specifically address the refusal to eat, much less the refusal to eat in a prison context.[1]  In addition, even if a right to refuse to eat can be inferred from the right to refuse medical treatment, this inferred right is subject to significant limitations in the prison context.  *See Aamer v. Obama*, 742 F.3d 1023, 1041, 1040 (D.C. Cir. 2014) (explaining that the "overwhelming majority of courts have concluded . . . that absent exceptional circumstances prison officials may force-feed a starving inmate actually facing the risk of death") (listing cases); *see also Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) (federal prisoner's allegation of force-feeding by prison authorities did not state constitutional claim when attachments to pleadings reflected a medical determination that force-feeding was necessary to the inmate's health, and that regulations authorized the force-feeding of hunger-striking inmates); *In re Soliman*, 134 F. Supp. 2d 1238, 1254 (N.D. Ala. 2001) (finding that force-feeding a hunger-striking inmate did not violate inmate's First Amendment rights).

Plaintiff also cites numerous district court and out-of-circuit cases that he claims establish a constitutional right to refuse to eat in a prison context.  None of these cases are binding upon this court.  "Out-of-circuit cases are not binding on this Court and therefore do not constitute 'controlling authority."  *Farrakhan v. Gregoire*, 590 F.3d 989, 1000 (9th Cir.), *overruled on other grounds*, 623 F.3d 990 (9th Cir. 2010) (en banc).  "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."  *Camreta v. Greene*, 563 U.S. 692, 131 S. Ct. 2020, 2033 n.7 (2011).  Having thoroughly reviewed the cases cited by Plaintiff, the Court concludes that there is no constitutional right to refuse to eat which transformed Plaintiff's hunger strike into protected

---

[1] In *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990), the Supreme Court held that a competent person has a liberty interest in refusing unwanted treatment, including lifesaving hydration and nutrition.  *Cruzan*, 497 U.S. at 277–78.  In *Washington v. Harper*, 494 U.S. 210 (1989), the Supreme Court held that a prisoner possesses "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."  *Washington*, 494 U.S. at 221–22.  In *Vitek v. Jones*, 445 U.S. 480 (1980), the Supreme Court held that "transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections."  *Vitek*, 445 U.S. at 494.

United States District Court
Northern District of California

conduct.

Plaintiff claims that California cases and statutes, and PBSP policies, have created a liberty interest in refusing to eat.  In support of his argument that California has created a liberty interest in refusing to eat, Plaintiff cites to section 4650 of the California Probate Code; section 2600 of the California Penal Code; *Thor v. Sup. Ct.*, 5 Cal. 4th 725, 734 (1993); *In re Conservatorship of Wendland*, 26 Cal. 4th 519, 533 (2001); *Bouvia v. Sup. Ct.*, 179 Cal. App. 3d 1127 (1986); and sections 3351, 3353.1, and 3361 of title 15 of the California Code of Regulations.  These statutes and cases only establish a right to refuse medical treatment.  They do not directly address whether there is a right to refuse to eat in a prison context.[2]

Plaintiff is also mistaken in arguing that PBSP policies have created a right to refuse to eat. Under certain circumstances, state prison regulations may create a liberty interest that is protected under the Due Process Clause.  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 461 (1989).  To do so, the regulations must (1) "contain 'substantive predicates' governing an official's decision regarding a matter directly related to the individual"; and (2) "employ 'explicitly mandatory language' specifying the outcome that must be reached upon a finding that the substantive predicates have been met."  *Dix v. County of Shasta*, 963 F.2d 1296, 1299 (9th Cir. 1992) (quoting *Thompson*, 490 U.S. at 462–63).  Plaintiff claims that his liberty interest in refusing to eat was created by the PBSP Hunger Strike Information Sheet; the PBSP Health Care Services Medical Policies & Procedures, Vol. 4A, Chapter 23; and the California Department of Corrections and

---

[2] *See, e.g.*, Cal. Probate Code § 4650 ("the law recognizes that an adult has the fundamental right to control the decisions relating to his or her own health care, including the decision to have life-sustaining treatment withheld or withdrawn"); Cal. Penal Code § 2600 (prisoner may only be deprived of such rights as are reasonably related to legitimate penological interests, with the exception of the rights set forth in *Thor*); *Thor v. Superior Court*, 5 Cal. 4th at 744 ("we conclude that a competent, informed adult, in the exercise of self-determination and control of bodily integrity, has the right to direct the withholding or withdrawal of life-sustaining medical treatment, even at the risk of death, which ordinarily outweighs any countervailing state interest."); *In re Conservatorship of Wendland*, 26 Cal. 4th at 533 (the competent adult's right to refuse medical treatment may be safely considered established, at least in California); *Bouvia v. Sup. Ct.*, 179 Cal. App. 3d at 1137, 1143 (right to refuse medical treatment includes right to refuse force-feeding that is keeping plaintiff alive); 15 Cal. Code Regs., tit. 15, § 3351 (discussing inmate's right to refuse health care treatment, including medication, and dental treatment); 15 Cal. Code Regs. § 3353.1 (listing criteria for inmate to be considered capable of giving informed consent); 15 Cal. Code Regs., tit. 15, § 3361 (discussing requirements for provision of mental health care services).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Rehabilitations ("CDCR") Health Care Services ("HCS") Medical Policies and Procedures, Vol.

2   4, Chapter 22 and Vol. 6, Chapter 47.  PBSP Health Care Services Medical Policies & Procedures,

3   Vol. 4A, Chapter 23, was not filed in the record and is not readily available to the Court, so the

4   Court has been unable to review it.  However, the other prison policies cited by Plaintiff do not

5   create a liberty interest in refusing to eat.  The PBSP Hunger Strike Information Sheet sets forth

6   the effects of starvation and avoiding fluids, the dangers of re-feeding, and the prison's policy on

7   medical care during a hunger strike, and urges the inmate to choose a representative to make

8   important decisions should the hunger strike affect the inmate's ability to express his wishes.  *See*,

9   *e.g.*, Docket No. 5 at 13–14 (PBSP Hunger Strike Informational Sheet).  Chapter 22 of Volume 4

10  of the CDCR HCS Medical Policies and Procedures sets forth how to provide medical care to

11  inmates participating in a hunger strike.  Chapter 47 of Volume 6, of the CDCR HCS Medical

12  Policies and Procedures describes the procedure for verifying an inmate's informed consent or

13  refusal for complex medical treatments or procedures.  After reviewing the cited California cases,

14  California statutes, and prison regulations, the Court concludes that neither PBSP nor California

15  has created a liberty interest in refusing to eat.

16      The Court now turns to whether a hunger strike, in a prison context, qualifies as speech

17  protected under the First Amendment.

18      Neither the Supreme Court nor the Ninth Circuit has directly addressed this question.

19  Defendants urge the Court to follow the district court in *Fulton v. Lamarque*, No. C 03-4709

20  RMW (PR), 2008 WL 901860 (N.D. Cal. Mar. 31, 2008), and find that a hunger strike is not

21  protected conduct for purposes of a First Amendment retaliation claim.  Defendants overstate the

22  holding in *Fulton*.  In *Fulton*, the strike was not solely a hunger strike.  The plaintiffs' conduct

23  there consisted of an eight-day work strike, a three-day hunger strike, assaults and threats of

24  assaults on other inmates who refused to participate in the strike, and disruption to the prison's

25  ability to distribute meals to inmates.  *Fulton*, 2008 WL 901860, at *5.  The *Fulton* court stated

26  that there was no First Amendment right to engage in this particular kind of strike.  *Id.*  Here,

27  Plaintiff's hunger strike consisted solely of refusing meals.  The *Fulton* court did not address

28  whether there was a First Amendment right to engage in a hunger strike alone, so that case is not

11

1    on point.

2         The Court turns to the Supreme Court's First Amendment jurisprudence for guidance.  The

3    Supreme Court has recognized that the First Amendment does not solely protect the "spoken or

4    written word," but also protects "conduct [that] may be sufficiently imbued with elements of

5    communication to fall within the scope of the First and Fourteenth Amendments." *Texas v.*

6    *Johnson*, 491 U.S. 397, 404 (1989) (internal citations and quotation marks omitted).  "In deciding

7    whether particular conduct possesses sufficient communicative elements to bring the First

8    Amendment into play, [the Supreme Court asks] whether '[a]n intent to convey a particularized

9    message was present, and [whether] the likelihood was great that the message would be

10   understood by those who viewed it.'"  *Id.* at 404 (internal citation omitted).  The Supreme Court

11   went on to describe several examples of "expressive" conduct which were protected under the

12   First Amendment:  students wearing black armbands to protest American military involvement in

13   Vietnam; a sit-in by blacks in a "whites only" area to protest segregation; wearing of American

14   military uniforms in a dramatic presentation criticizing American involvement in Vietnam;

15   picketing about a wide variety of causes; attaching a peace sign to the flag; refusing to salute the

16   flag; and displaying a red flag.  *Id.*  A hunger strike that is intended to convey a particularized

17   message and has a high likelihood of conveying that message is therefore speech protected by the

18   First Amendment.

19        Here, Plaintiff alleges that he engaged in a hunger strike to protest the SHU living

20   conditions after he was unable to obtain relief through either prison grievances or state and federal

21   court litigation.  *See* FAC at 2–4.  He states that the "clear intent [of his hunger strike] was to

22   redress his grievances [regarding SHU living conditions] and bring public attention to these

23   conditions of confinement which he must endure . . ."  FAC at 3.  Accepting as true all of the

24   factual allegations contained in the amended complaint, and keeping in mind that *pro se* pleadings

25   must be liberally construed, *Balistreri*, 901 F.2d at 699, the Court finds that Plaintiff's allegations

26   that prison officials retaliated against him for engaging in a hunger strike intended to protest SHU

27   living conditions state a cognizable claim for First Amendment retaliation.  Defendants' motion to

28   dismiss Plaintiff's First Amendment retaliation claims for failure to state a claim is DENIED.

United States District Court
Northern District of California

United States District Court
Northern District of California

**II.      Summary Judgment Motion**

    **A.      Standard of Review**

    Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

    A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp*, 477 U.S. at 322–23.  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Id.*  The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)).

    For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).  The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

    In deciding the summary judgment motion, the Court has considered the entire record.

    **B.      Housing Transfer Claim**

    Plaintiff alleges that Defendants transferred him to Unit C12 in retaliation for his exercise

of his First Amendment rights and with deliberate indifference to his safety.  The Ninth Circuit has stated that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  Further, a public employee "causes" a constitutional violation for purposes of 42 U.S.C. § 1983 when he has "some kind of direct personal participation in the deprivation."  *Id.* at 744.  It is undisputed that Officer Brunner had no involvement in Plaintiff's transfer from Unit C3 to Unit C12.  Officer Brunner had no involvement in the decision to transfer Plaintiff.  Brunner Decl. ¶ 8.  Officer Brunner also had no involvement in the actual transfer of Plaintiff because Officer Brunner was not on duty in Unit C12 that day.  Brunner Decl. ¶ 4.  Officer Drager also had no involvement in the decision to transfer Plaintiff.  Drager Decl. ¶ 7.  However, according to Plaintiff's allegations, Officer Drager personally participated in Plaintiff's actual transfer by helping Plaintiff move his property and by escorting Plaintiff to Unit C12.  Drager Decl. ¶ 2.  Viewing the record in the light most favorable to Plaintiff, the Court finds that there is no triable issue of fact as to whether Officer Brunner caused any constitutional deprivation arising out of Plaintiff's housing transfer.  Accordingly, the Court GRANTS summary judgment in favor of Officer Brunner as to the claims that Officer Brunner transferred Plaintiff to Unit C12 in retaliation for Plaintiff's exercise of his First Amendment rights and with deliberate indifference to Plaintiff's safety.  The Court addresses at sections II.C–D below whether Officer Drager's direct personal participation in the housing transfer violated Plaintiff's constitutional rights.

### C.      Retaliation Claim

Plaintiff alleges that Defendants referred to Plaintiff as a debriefer in front of other inmates and transferred him to Unit C12 in retaliation for Plaintiff accessing the court and engaging in a hunger strike.  Docket No. 5 ("FAC") at 8.  Defendants argue that they are entitled to summary judgment because (1) Plaintiff was not engaged in protected activity; (2) Defendants' conduct did not chill Plaintiff's speech; and (3) Plaintiff was transferred to Unit C12 in order to reasonably advance a legitimate correctional goal.  Docket No. 22 at 19–21.  Plaintiff argues that Defendants'

statements on August 8, 2013, during Plaintiff's housing transfer, and on August 17, 2013 are evidence of Defendants' retaliatory motive for transferring Plaintiff to Unit C12 and for referring to Plaintiff as a debriefer.

### 1)   Standard

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567–68 (footnote omitted); *accord Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (prisoner suing prison officials under § 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action did not advance legitimate penological goals, such as preserving institutional order and discipline).  Retaliation by a state actor for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84 (1977).  Retaliation, though it is not expressly referred to in the Constitution, is actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

The prisoner must show that the type of activity he was engaged in was constitutionally protected, that the protected conduct was a substantial or motivating factor for the alleged retaliatory action, and that the retaliatory action advanced no legitimate penological interest. *Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997) (inferring retaliatory motive from circumstantial evidence).  The prisoner bears the burden of pleading and proving absence of legitimate correctional goals for the conduct of which he complains. *Pratt*, 65 F.3d at 806.  At that point, the burden shifts to the prison official to show, by a preponderance of the evidence, that the retaliatory action was narrowly tailored to serve a legitimate penological purpose. *See Schroeder v. McDonald*, 55 F.3d 454, 461–62 (9th Cir. 1995) (defendants had qualified immunity for their decision to transfer prisoner to preserve internal order and discipline and maintain

United States District Court
Northern District of California

institutional security).

Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'" *Pratt*, 65 F.3d at 807 (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995)). In particular, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Id.* (quoting *Sandin*, 515 U.S. at 482).

The court should apply the four-factor test from *Turner v. Safley*, 482 U.S. 78 (1978), to determine whether the proffered legitimate penological interest is reasonably related to a regulation that infringes on a prisoner's constitutional rights even in a retaliation analysis. *See Brodheim v. Cry*, 584 F.3d 1262, 1272 (9th Cir. 2009) (noting that Ninth Circuit's practice of balancing the importance of the legitimate penological interest against the importance of the prisoner's infringed right was disapproved by the Supreme Court in *Shaw v. Murphy*, 532 U.S. 223 (2001)). The four-factor *Turner* test considers:

> (1) whether the regulation is rationally related to a legitimate and neutral governmental objective, (2) whether there are alternative avenues that remain open . . . to exercise the right, (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

*Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005) (citing *Turner*, 482 U.S. at 89).

### 2)    Analysis

#### a)    Because of the Protected Conduct

Plaintiff argues that he was engaged in the following types of protected conduct: accessing the courts and engaging in a hunger strike.[3] The Court analyzes whether these activities constitute

---

[3] Plaintiff alleges that he engaged in the following First Amendment conduct: "exercising his constitutionally protected rights to refuse to eat, [to] access the courts, to be free of cruel and unusual punishment, free sp[e]ech, and redress of grievances through a non-violent, non-aggressive, last resort, peaceful refusal to eat/hunger strike." FAC at 5. Plaintiff's allegations only set forth two instances of potential First Amendment conduct: accessing the courts and engaging in a hunger strike. The remaining acts listed are simply other ways of referring to accessing the courts and engaging in a hunger strike. By engaging in a hunger strike, Plaintiff refused to eat, attempted to exercise his right to free speech, and attempted to seek redress of

16

1   protected conduct for the purposes of a retaliation claim and if these activities motivated the

2   alleged retaliatory actions.

3                                    **i)        Accessing the Courts**

4            It is undisputed that Plaintiff has filed multiple lawsuits in state and federal courts

5   protesting his conditions of confinement.  Docket No. 1 at 12.  The Ninth Circuit has recognized

6   that there is a clearly established First Amendment right to pursue civil rights litigation in the

7   courts.  *See Schroeder*, 55 F.3d at 461 (recognizing First Amendment right to pursue civil

8   litigation in the courts); *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985) (same).

9            There is evidence that Officer Brunner was aware of Plaintiff's civil rights litigation.

10   When Officer Brunner was asked why he had referred to D Pod inmates as "debriefers," Officer

11   Brunner responded that the captain had the D Pod inmates on "shit status" for filing lawsuits.

12   Belmudes Decl. ¶ 11; Treglia Decl. ¶ 6; Arredondo Decl. ¶ 8.  However, nothing in the record

13   indicates that Officer Drager was aware that Plaintiff had filed lawsuits against PBSP correctional

14   officers.  When Officer Drager was asked why Plaintiff, Belmudes, and Arredondo were

15   transferred from Unit C3 to Unit C12 and why they were labeled as "debriefers," Officer Drager

16   only referenced the hunger strike in his answer.  Belmudes Dec. ¶¶ 4, 5; Arredondo Decl. ¶¶ 4, 5.

17   Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has raised a

18   genuine issue of material fact as to whether Officer Brunner referred to Plaintiff as a debriefer in

19   retaliation for Plaintiff's civil rights litigation, but that there is no evidence supporting an inference

20   that Officer Drager took adverse action against Plaintiff in retaliation for Plaintiff's civil rights

21   litigation.

22                                    **ii)       Hunger Strike**

23            As discussed *supra* in Section I.B.3, a hunger strike is protected conduct under the First

24   Amendment if it was intended to convey a particularized message of protest and that the hunger

25   strike was likely to be understood as a protest.  It is undisputed that Plaintiff and other inmates

26   engaged in a hunger strike to protest the CDCR's policy of placing inmates in SHU confinement

27   _____

28   grievances.  In accessing the courts, Plaintiff sought redress of his grievances and to be free of
     cruel and unusual punishment.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

for extended periods of time, and to protest the conditions of SHU confinement, which the hunger-striking inmates viewed as cruel and unusual punishment.  Belmudes Decl. ¶ 3.  It is also undisputed that defendants and CDCR prison officials understood the hunger strike as a protest.  The record shows that on August 7, 2013, Plaintiff was interviewed by Officer Drager regarding his refusal of meals.  Docket No. 23-2 at 27.  Plaintiff was questioned as to why he was refusing meals and Plaintiff responded that he was on a hunger strike due to SHU living conditions.  Docket No. 23-2 at 27.  The Court therefore finds that Plaintiff's July 2013 and August 2013 hunger strikes constituted conduct protected under the First Amendment.  *Texas*, 491 U.S. at 404.  The Court now addresses whether Defendants' actions were motivated by Plaintiff's hunger strikes.

Viewing the facts in the light most favorable to Plaintiff, the Court finds that there is a triable issue of fact as to whether Officer Drager's alleged retaliatory actions — participating in Plaintiff's housing transfer and calling Plaintiff a debriefer — were motivated by Plaintiff's hunger strike.  Officer Drager implied that if Plaintiff discontinued his hunger strike, he might not be moved.  In responding to Plaintiff's question as to why Officer Drager had identified Plaintiff as a debriefer, Officer Drager replied: "You guys want to play games with this hunger strike and make my job harder, I can play games too.  You guys are moving one way or another.  I suggest you either start eating or pack it up."  Belmudes Decl. ¶ 5; Arredondo Decl. ¶ 5.

In addition, the Court finds that there is a triable issue of fact as to whether Officer Brunner referred to Plaintiff as a debriefer because he was engaged in a hunger strike.  When Ruiz, Argumedo, and Treglia demanded that Officer Brunner tell the other inmates that he had been lying when he yelled out: "D Pod is where all the debriefers slash hunger strikes are," Officer Brunner told Ruiz, Argumedo, and Treglia that he would think about making such a statement if they took their dinner trays, which was a clear reference to the hunger strike.  Although Officer Brunner denies stating that D Pod was where the "debriefers slash hunger strikers" were housed, the court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec. Serv., Inc.*, 809 F.2d at 630.

18

1    Viewing the facts in the light most favorable to Plaintiff, the Court finds that there is a

2    triable issue of fact as to whether Officers Drager's and Brunner's alleged retaliatory actions were

3    motivated by Plaintiff's participation in the hunger strike.

**b)    Chilling Effect**

5    Defendants argue that they are entitled to summary judgment on Plaintiff's retaliation

6    claim because their conduct did not chill Plaintiff's speech.  Defendants argue that "it is doubtful

7    that the alleged statements from Brunner and Drager, or Plaintiff's move to another SHU housing

8    unit, would deter an inmate of ordinary firmness from participating in future hunger-strikes."

9    Docket No. 22 at 20.  Defendants further argue that the fact that Plaintiff continued to refuse food

10   for another two days after the cell transfer, until August 10, 2013, indicates that there was no

11   chilling effect.  *Id.*

12   A prisoner need not demonstrate a *total* chilling of his First Amendment rights in order to

13   establish a retaliation claim.  *See Rhodes*, 408 F.3d at 568–69 (rejecting argument that inmate did

14   not state a claim for relief because he had been able to file inmate grievances and a lawsuit).  That

15   a prisoner's First Amendment rights were chilled, though not necessarily silenced, is enough.  *Id.*

16   at 569 (destruction of inmate's property and assaults on the inmate enough to chill inmate's First

17   Amendment rights and state retaliation claim, even if inmate filed grievances and a lawsuit).

18   "'[A] retaliation claim may assert an injury no more tangible than a chilling effect on First

19   Amendment rights.'"  *Brodheim v. Cry*, 584 F.3d 1262, 1269–70 (9th Cir. 2009) (citing *Gomez v.

20   Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001); *see also Burgess v. Moore*, 39 F.3d 216, 218 (8th

21   Cir. 1994) ("[A] threat of retaliation is sufficient injury if made in retaliation for an inmate's use of

22   prison grievance procedures.").  Plaintiff has provided evidence that being labeled a debriefer or

23   snitch placed him at risk of assault from other inmates.  Plaintiff provides PBSP Lieutenant

24   Jeremy Frisk's September 12, 2013 deposition in *Ashker v. Schwarzenegger*, C No. 4:09-CV-

25   05796 CW (N.D. Cal. filed Dec. 9, 2009) to support his claim.  Lt. Frisk was a sergeant in the

26   Institutional Gang Investigations Unit from 2010 to 2013.  Docket No. 39-1 at 28.  In his

27   deposition, Lt. Frisk acknowledges that the code of prison gangs requires the gangs to assault or

28   kill debriefers for defecting from the gang.  *Id.* at 81.  Viewing the facts in the light most favorable

United States District Court
Northern District of California

19

1   to Plaintiff, the Court concludes that by providing evidence that other inmates heard Officers

2   Brunner and Drager refer to Plaintiff as a debriefer, and by providing evidence that debriefers are

3   at risk of assault from prison gang members, Plaintiff has raised a triable issue of fact as to

4   whether Defendants' actions chilled the exercise of his First Amendment rights.

5                    c)      **Legitimate Correctional Goal**

6           Defendants do not argue that they reasonably advanced a legitimate correctional goal when

7   they referred to Plaintiff as a debriefer.  The Court therefore turns to Defendants' argument that

8   Plaintiff's transfer to Unit C12 reasonably advanced the legitimate correctional goal of ensuring

9   that hunger-strikers were medically monitored.  Retaliation by a state actor for the exercise of a

10  constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different

11  reasons, would have been proper.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S.

12  274, 283–84 (1977).  The question, therefore, is why Plaintiff was transferred to Unit C12, and not

13  whether the transfer could have had a legitimate correctional goal.  Defendants have not explained

14  why Plaintiff was transferred to Unit C12 and make only vague statements about institutional need

15  and Unit C12's proximity to medical monitoring.  According to Facility Captain Olson:

16          Pursuant to [CDCR Operational Procedure No. 228, which delineated the roles and
        responsibilities of prison staff during individual or mass hunger strikes], during the 2013
17      mass inmate hunger strike, certain hunger strike participants were relocated to Unit C12
        due to institutional need.  It should be noted that based on its location, unit C12 in SHU is
18      within close proximity to program and medical facilities in C SHU.

19  Olson Decl. ¶ 10.  However, there is nothing in the record that indicates that there was an

20  institutional need to transfer Plaintiff or that Plaintiff was suffering from health issues that

21  required medical monitoring.  In contrast, Plaintiff has provided evidence that, during the housing

22  transfer, Officer Drager told Plaintiff: "I suggest you either start eating or pack it up."  Belmudes

23  Decl. ¶ 5; Arredondo Decl. ¶ 5.  A jury could reasonably infer from Officer Drager's statement

24  that the housing transfer was motivated by Plaintiff's participation in the hunger strike.  Viewing

25  the facts in the light most favorable to Plaintiff, the Court concludes that there is a genuine dispute

26  as to whether Plaintiff's transfer to Unit C12 reasonably advanced a legitimate correctional goal.

27          **D.      Eighth Amendment Claim**

28          Plaintiff alleges that Defendants acted with deliberate indifference to Plaintiff's safety

United States District Court
Northern District of California

20

when they transferred him to the "Debriefer Unit" and when they referred to him as a debriefer. FAC at 9.  Defendants argue that they are entitled to summary judgment on Plaintiff's Eighth Amendment claims because the housing transfer was for protective reasons, Defendants were not involved in the housing transfer, and Defendants did not cause any harm to Plaintiff when they referred to him as a debriefer.

### 1) Standard

The Eighth Amendment requires that prison officials take reasonable measures to guarantee the safety of prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  In particular, prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Id.* at 833.  The failure of prison officials to protect inmates from attacks by other inmates or from dangerous conditions at the prison violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious; and (2) the prison official is, subjectively, deliberately indifferent to inmate health or safety. *Id.* at 834.  A prison official is deliberately indifferent if he knows of and disregards an excessive risk to inmate health or safety by failing to take reasonable steps to abate it. *Id.* at 837.

### 2) Transfer to Unit C12

Defendants argue that they are entitled to summary judgment on this claim because the housing transfer was for protective reasons and because Defendants were not involved in the housing transfer.  The Court agrees that Defendants are entitled to summary judgment in their favor on the Eighth Amendment claim against Officer Brunner, with respect to the housing transfer, because there is no evidence that Officer Brunner was involved in the housing transfer. However, the Court finds that there is a genuine issue of material fact as to whether Officer Drager's involvement in Plaintiff's housing transfer violated Plaintiff's Eighth Amendment rights. Plaintiff has presented evidence that Officer Drager physically assisted with Plaintiff's housing transfer.  Arredondo Decl. ¶ 5.  There is also evidence from which it can be reasonably inferred that Officer Drager understood Unit C12 to be a unit where debriefers were housed.  Belmudes Decl. ¶ 5; Treglia Decl. ¶ 2.  There is also evidence that Officer Drager wanted other inmates to think that Plaintiff was a debriefer.  Plaintiff and other inmates describe Officer Drager

United States District Court
Northern District of California

announcing Plaintiff's housing move to "the Debriefer Unit" in a voice loud enough to be heard by all the inmates housed in C3.  Belmudes Decl. ¶ 4; Arredondo Decl. ¶¶ 3–4.  There is also evidence from which it can be reasonably inferred that Officer Drager did not believe Plaintiff to be a debriefer, and that the transfer was intended to punish Plaintiff for his participation in the hunger strike.  When Plaintiff asked Officer Drager why he referred to Plaintiff as a debriefer, Officer Drager responded that Plaintiff was playing games by engaging in the hunger strike and that Officer Drager could play games too.  Belmudes Decl. ¶ 4; Arredondo Decl. ¶¶ 3–4.  Finally, Plaintiff has provided evidence that an inmate known as a debriefer may be assaulted or killed by other inmates.  Docket No. 39-1 at 81 (PBSP Lt. Frisk Deposition).  Defendants' argument that the housing transfer was for protective reasons is not supported by the record.  Capt. Olson provides general reasons (institutional need and medical monitoring) why a hunger-striking inmate might be transferred to Unit C12, but does not specify whether these reasons applied to Plaintiff's transfer, and nothing else in the record establishes that these general reasons applied to Plaintiff.  *See* discussion *infra* Section II.C.2.c.  Because the Court's function on a summary judgment motion is not to weigh conflicting evidence with respect to a disputed material fact, *see T.W. Elec. Serv., Inc.*, 809 F.2d at 630, the Court finds that there is a genuine issue of material fact as to whether Officer Drager was deliberately indifferent to Plaintiff's safety, in violation of Plaintiff's Eighth Amendment rights, when Officer Drager transferred Plaintiff to Unit C12.

### 3)      Referring to Plaintiff as a Debriefer

Defendants argue that they are entitled to summary judgment on this claim because Plaintiff was never assaulted by other inmates for being a debriefer.  However, the Supreme Court has held that the Eighth Amendment applies to official conduct that is sure or very likely to cause serious injury at the hands of other inmates.  *Cf. Helling v. McKinney*, 509 U.S. 25, 33 (1993) (rejecting argument that Eighth Amendment "does not protect against prison conditions that merely threaten to cause health problems in the future, no matter how grave and imminent the threat").  An inmate does not have to wait until he is actually assaulted before obtaining relief.  *See Farmer*, 511 U.S. at 845 (suggesting injunctive relief as possible remedy).  Courts have recognized that being labeled a "snitch" can place an inmate at a risk of harm.  *See Valandingham*,

866 F.2d at 1138–39 (reversing the district court's grant of summary judgment on retaliation claim); *see also Wilkinson* v. *Austin*, 545 U.S. 209, 227 (2005) ("[t]estifying against, or otherwise informing on, gang activities can invite one's own death sentence").  Plaintiff has provided sworn testimony from PBSP Lt. Frisk acknowledging that the code of prison gangs requires the gangs to assault or kill debriefers for defecting from the gang.  Docket No. 39-1 at 81.  Defendants do not dispute the danger faced by debriefers.  Accordingly, viewing the facts in the light most favorable to Plaintiff, the Court finds that there is a genuine issue of material fact as to whether Defendants referred to Plaintiff as a debriefer with deliberate indifference to his safety, in violation of Plaintiff's Eighth Amendment rights.

### E.      Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A court considering a claim of qualified immunity makes a two-pronged inquiry: (1) whether the plaintiff has alleged the deprivation of an actual constitutional right and (2) whether such right was clearly established at the time of the defendant's alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 535 U.S. 194, 201 (2001)).  The court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case.  *Pearson*, 555 U.S. at 236 (noting that while the *Saucier* sequence is often appropriate and beneficial, it is no longer mandatory).  "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," and must, as in other cases, view the evidence in the light most favorable to the nonmovant.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

"[A] right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'  In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (citations omitted).  The inquiry of whether a constitutional right was clearly established must be undertaken in light of the "specific context" of the case, not

23

as a broad general proposition. *Saucier*, 533 U.S. at 202. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.*; *see, e.g.*, *Pearson*, 555 U.S. at 243–45 (concluding that officers were entitled to qualified immunity because their conduct was not clearly established as unconstitutional as the "consent-once-removed" doctrine, upon which the officers relied, had been generally accepted by the lower courts even though not yet ruled upon by their own federal circuit).

A court determining whether a right was clearly established looks to "Supreme Court and Ninth Circuit law existing at the time of the alleged act." *Community House, Inc. v. City of Boise*, 623 F.3d 945, 967 (9th Cir. 2010) (citing *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)). In the absence of binding precedent, the court should look to all available decisional law, including the law of other circuits and district courts. *See id.* Unpublished district court decisions may also "inform" the court's analysis. *Sorrels v. McKee*, 290 F.3d 965, 971–72 (9th Cir. 2002). It will, however, "be a rare instance in which, absent any published opinions on point or overwhelming obviousness of illegality, [that the court] can conclude that the law was clearly established on the basis of unpublished decisions only." *Id.* Post-incident cases generally are not relevant unless they determine the law at the time of the incident, however. *See Osolinski*, 92 F.3d at 936 (citation omitted).

### 1)    First Amendment Retaliation Claim

The question before the Court is whether Plaintiff's right to litigation activity and to participate in a hunger strike were clearly established rights for the purposes of qualified immunity.

### a)    Access to the Courts

The Court has found that there is a genuine issue of material fact as to whether Officer Brunner referred to Plaintiff as a debriefer in retaliation for Plaintiff's civil rights litigation. At the time of the offense, the law was clearly established that an inmate has a First Amendment right to access the courts. *See Lewis v. Casey*, 518 U.S. 343, 350 (1996)*; Bounds v. Smith*, 430 U.S. 817, 821 (1977), *Schroeder*, 55 F.3d at 461 (recognizing First Amendment right to pursue civil

24

litigation in the courts); *Rizzo*, 778 F.2d at 532.  Accordingly, Officer Brunner is not entitled to qualified immunity with respect to Plaintiff's claim that Officer Brunner retaliated against him for accessing the courts.

### b)   Hunger Strike

The Court has found that there is a genuine issue of material fact as to whether Officers Brunner and Drager referred to Plaintiff as a debriefer, and whether Officer Drager transferred Plaintiff to Unit C12, in retaliation for Plaintiff engaging in a hunger strike.  However, the Court now finds that Officers Brunner and Drager are entitled to qualified immunity for these actions.

There is no Supreme Court precedent prior to — or after — August 8, 2013, discussing whether participation in a hunger strike qualifies as speech protected under the First Amendment, especially within a prison setting.  A search of Ninth Circuit cases also reveals no opinions prior to — or after — August 8, 2013 addressing the question of whether an inmate's hunger strike is "protected conduct."  In addition, a review of district court and out-of-circuit cases reveals only a handful of published cases on the issue, none of which speak definitively about this issue.[4]  In *Stefanoff v. Hays County, Tex.*, 154 F.3d 523, 527 (5th Cir. 1998), the Fifth Circuit noted that "a hunger strike may be protected by the First Amendment if it was intended to convey a particularized message."  *Id.* (citing *Texas*, 491 U.S. at 404).  However, the Fifth Circuit concluded that the inmate's hunger strike and correspondence with the media was "sufficiently disruptive" such that the defendant "had a legitimate penological interest in curtailing [it]."  *Id.*  In *In re Soliman*, 134 F. Supp. 2d 1238, 1252–53 (N.D. Ala. 2001), the district court assumed that the inmate had a First Amendment right to engage in a hunger strike to protest prison practices, but found that the defendants' force-feeding of the inmate did not violate the inmate's First Amendment right to conduct a hunger strike.

The remaining district court and out-of-circuit cases discussing this issue are not only

---

[4] The lack of clearly established law addressing this issue may be due in part to prisoner-plaintiffs' failure to prosecute their cases, *see, e.g.*, *Morris v. McBride*, No. 14-CV-05269-WHO (PR) (dismissed for failure to file amended complaint), or to appeal unfavorable decisions, *see, e.g.*, *Espinoza v. Kellogg*, 12-5414 BLF (PR) (court found that plaintiff's hunger strike was conduct protected by the First Amendment but that defendants were entitled to qualified immunity; plaintiff did not appeal the decision).

United States District Court
Northern District of California

unpublished, but are also inconsistent in the depth of their analysis regarding whether a hunger strike is considered protected speech in a prison setting. *Compare Perez v. Gates*, No. 13-CV-05359-VC, 2015 WL 5569443, at *3 (N.D. Cal. Sept. 22, 2015) (assuming that a hunger strike was protected conduct for the purposes of a First Amendment retaliation claim but finding that claims related to the hunger strike were unexhausted); *Ellis v. Foulk*, No. 2:14-CV-00802 AC P, 2015 WL 4662766, at *6 (E.D. Cal. Aug. 5, 2015) (noting that "participating in a hunger strike can, in certain circumstances, constitute activity protected by the First Amendment" but finding that prisoner failed to state a retaliation claim where the basis of his claim was prisoner's preference to eat food from the canteen and in his cell); *Morris v. McBride*, No. 14-CV-05269-WHO (PR), 2015 WL 1519531, at *2 (N.D. Cal. Apr. 3, 2015) (finding that "going on a hunger strike may well meet the standard for exercising the constitutional right of free speech" but dismissing retaliation claim with leave to amend for failure to allege that plaintiff suffered harm); *Bruce v. Woodford*, No. 07–cv–00269–AWI–DLB PC, 2009 WL 256390, *3 (E.D. Cal. Feb. 3, 2009) (liberally construed, inmate stated cognizable retaliation claim when he alleged that he was placed in segregation for his jailhouse lawyer activities, hunger strike participation, and filing of grievances); *Ajaj v. Fed. Bureau of Prisons*, No. 08-2006 MSK MJW, 2011 WL 902440, at *12 (D. Colo. March 10, 2011) ("The Defendants do not appear to dispute that a hunger strike can constitute activity protected by the First Amendment, and the Court agrees that, in certain circumstances, it can.") (citing *Bruce*, 2009 WL 256390); *Gevas v. Ryker*, Civil No. 10-493-MJR, 2011 WL 711078, at *5 (S.D. Ill. Feb. 22, 2011) *reconsidered in part on other grounds by Gevas v. Ryker*, No. 10-CV-493-MJR-SCW, 2011 WL 1458075 (S.D. Ill. Apr. 15, 2011) (inmate sufficiently stated retaliation claim where the protected conduct was filing of grievances and declaring a hunger strike); *Brown v. Graham*, No. 9:07 CV 1353, 2010 WL 6428251, at *16 (N.D.N.Y.  March 30, 2010) (same) (citing *Green v. Phillips*, No. 04 CIV. 10202 (TPG), 2006 WL 846272 (S.D.N.Y. Mar. 31, 2006)); *Hankins v. Beard*, Civil Action No. 07-332 Erie, 2009 WL 5821032, at *26 (W.D. Pa. Nov. 30, 2009), *report and recommendation adopted in relevant part by Hankins v. Beard*, Civil Action No. 07-332 Erie, 2010 WL 454910 (W.D. Pa. Feb. 2, 2010) (hunger strike was protected activity under the First Amendment but challenged strip

searches would have been conducted absent inmate's hunger strike; granting summary judgment in favor of defendants on retaliation claim); *Green*, 2006 WL 846272, at *3 (questioning validity of hunger strike as protected conduct, but assuming without deciding that it is for purposes of analyzing motion to dismiss) *with Khaldun v. Daughtery*, No. 09-cv-350-SEB-TAB, 2009 WL 5170039, at *1 (S.D. Ind. Dec. 17, 2009) ("[prisoner's] act of going on a hunger strike was not protected activity under the First Amendment"); *Lee v. Burke*, No. 07-CV-1718, 2007 WL 4608730, at *1 (W.D. La. Dec. 11, 2007) (finding that inmate's hunger strike did not qualify as First Amendment speech when inmate did not allege that the hunger strike was intended to convey a particular message); *White v. Suneja*, No. 10-CV-332-JPG, 2010 WL 4719663, at *1 (S.D. Ill. Nov. 15, 2010) ("The Court is not aware of any specific guarantee under the First Amendment, or any other constitutional provision, that protects inmate hunger strikes.").

Notably, at least one district court granted qualified immunity on this same underlying claim prior to September 7, 2011. *See Brown*, 2010 WL 6428251, at *23 (granting qualified immunity on prisoner's retaliation claim because whether a hunger strike is "protected conduct" is not "clearly established" law).

Accordingly, the Court GRANTS summary judgment in favor of Defendants with respect to Plaintiff's claims that he was called a debriefer and transferred to Unit C12 in retaliation for his hunger strike in violation of his First Amendment.

**2)     Eighth Amendment Claim**

The question before the Court is whether, for the purposes of qualified immunity, Plaintiff had a right to be free from deliberate indifference to his safety, and, more specifically, whether he had a right not to be labelled a debriefer in front of other inmates. The Court has found that there is a genuine issue of material fact as to whether Officers Brunner and Drager labelled Plaintiff a debriefer within earshot of other inmates and transferred Plaintiff to a "debriefer unit," in violation of his rights under the Eighth Amendment. At the time of the offense, the law was clearly established that a prison official violates the Eighth Amendment when the official acts with deliberate indifference to inmate safety and the official's action results in the inmate being "incarcerated under conditions posing a substantial risk of serious harm." *See Farmer*, 511 U.S. at

27

United States District Court
Northern District of California

834.  At that time, the law was also clearly established that telling other inmates that a prisoner is a "snitch" violated an inmate's right to be free from harm.  *Valandingham*, 866 F.2d at 1138 (Eighth Amendment claim stated where prisoner alleged that he was approached by fellow prisoners and threatened with harm because defendants had told other inmates that he was a snitch); *see also Miller v. Williams*, 976 F.2d 737 (9th Cir. 1992) ("This court has recognized a claim under 42 U.S.C. § 1983 'for violation of [an inmate's] right to be protected from violence while in custody, [and] also for violation of his right of access to the courts' where prison officials labeled an inmate as a 'snitch' in retaliation for the inmate petitioning prison and government officials for a redress of his grievances.") (citing *Valandingham*); *cf. Douglas v. Oregonian Pub. Co.*, 465 F. App'x 714, 715 (9th Cir. 2012) (prisoner's allegation that "other inmates threatened him as a result of the state defendants' actions in falsely labeling him a 'snitch' . . .  sufficiently alleged a Fourteenth Amendment violation of his right to safety while in custody."

        If Plaintiff's version of events is credited, a jury reasonably could conclude that Defendants referred to Plaintiff as a debriefer and transferred him to a "debriefer unit" because they were aware that doing so would expose Plaintiff to substantial risk of serious harm. Accordingly, qualified immunity may not be granted at this stage, because Defendants' entitlement to immunity will depend on the resolution of disputed facts.  *See Tolan*, 134 S. Ct. at 1866–68 (in conducting qualified immunity analysis, courts must draw all reasonable inferences in favor of the non-moving party); *see, e.g., Irving v. Dormire*, 519 F.3d 441, 451 (8th Cir. 2008) (noting that four circuits have held that labeling an inmate a snitch violates the guard's duty to protect inmates , and denying qualified immunity where a prison guard falsely labeled an inmate as a snitch, concluding the guard was on fair notice that an inmate labeled as a snitch faces substantial risk of serious harm:  "after all, who better knows the opprobrium and consequent effect thereof that attaches to the label of snitch than those who work daily within the inmate population").

        **F.      Requests for Judicial Notice**

        Defendants have requested that the Court take judicial notice of the order granting summary judgment in *Treglia v. Kernan*, No. 5:12-cv-02522-LHK (N.D. Cal. Jan. 29, 2015).

United States District Court
Northern District of California

1    Docket No. 28.  Plaintiff opposes this request, arguing that *Treglia* is distinguishable in numerous

2    respects and that the *Treglia* court applied the incorrect legal standard in granting qualified

3    immunity.  Plaintiff also requests that the Court take judicial notice of the following documents:

4    (1) 2013 PBSP Hunger Strike Informational Sheet; (2) the September 12, 2014 Deposition of

5    PBSP Lieutenant Jeremy Frisk in *Ashker v. Schwarzenegger*, C No. 4:09-CV-05796 CW (N.D.

6    Cal. filed Dec. 9, 2009); (3) the November 18, 2014 Deposition of PBSP acting Associate Warden

7    David Jason Barneburg in *Ashker*; (4) the July 18, 2013 declaration of J. Zubiate in *Ashker*; (5) the

8    July 18, 2013 declaration of J. Bryan Elrod in *Ashker*; and (6) the official public statement of

9    California state senator Loni Hancock regarding the hunger strikes, dated September 5, 2013.

10   Docket No. 39-1 at 20–22.

11         Pursuant to Federal Rule of Evidence 201(b),
           [t]he court may judicially notice a fact that is not subject to reasonable dispute because it:
12         (1) is generally known within the trial court's territorial jurisdiction; or
           (2) can be accurately and readily determined from sources whose accuracy cannot
13         reasonably be questioned.

14   Fed. R. Evid. 201(b).  Although the Court "may take judicial notice of the existence of unrelated

15   court documents . . . it will not take judicial notice of such documents for the truth of the matter

16   asserted therein."  *In re Bare Escentuals, Inc. Sec. Lit.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal.

17   2010) (in considering defendant's motion to dismiss, the court took judicial notice of the existence

18   of unrelated court documents, but declined to take judicial notice of truth of the matters set forth in

19   these unrelated court documents); *see also McMunigal v. Bloch*, No. C 10–02765 SI, 2010 WL

20   5399219, *2 n. 1 (N.D. Cal. Dec. 23, 2010) (granting judicial notice of documents filed in another

21   lawsuit for purposes of noticing the existence of the lawsuit, claims made in the lawsuit, and that

22   various documents were filed, but not for the truth of the matters asserted therein).  Accordingly,

23   the Court GRANTS Defendants' request for judicial notice and Plaintiff's request for judicial

24   notice, and takes judicial notice of each document.  The judicially noticed fact in each instance is

25   limited to the existence of the document, not the truth of the matters asserted in the documents.

26                                    **CONCLUSION**

27         For the foregoing reasons, the Court orders as follows:

28         1.      Defendants' motion to dismiss Plaintiff's official-capacity claims against

                                             29

1   Defendants is GRANTED.  Plaintiff's official-capacity claims against Defendants are

2   DISMISSED with prejudice.  Defendants' motion to dismiss Plaintiff's §1983 claims for failure to

3   state a claim is DENIED.  Defendants' motion to dismiss Plaintiff's First Amendment retaliation

4   claims for failure to state a claim is DENIED.

5           2.      The Court GRANTS summary judgment in favor of Officer Brunner as to

6   Plaintiff's claims that Officer Brunner transferred Plaintiff to Unit C12 in violation of his First

7   Amendment and Eighth Amendment rights, and that Officer Brunner referred to Plaintiff as a

8   "debriefer" in retaliation for his hunger strike.  The Court GRANTS summary judgment in favor

9   of Officer Drager as to Plaintiff's claim that Officer Drager referred to him as debriefer in

10  retaliation for his civil rights litigation and in retaliation for his hunger strike, in violation of his

11  First Amendment rights, and that Officer Drager transferred Plaintiff to Unit C12 and referred to

12  him as a debriefer in violation of the First Amendment.  The Court DENIES summary judgment as

13  to the following claims: (1) Officer Brunner referred to Plaintiff as a debriefer in retaliation for

14  Plaintiff's civil rights litigation, in violation of the First Amendment; (2) Officer Brunner referred

15  to Plaintiff as a debriefer with deliberate indifference to Plaintiff's safety, in violation of the

16  Eighth Amendment;  (3) Officer Drager referred to Plaintiff as a debriefer with deliberate

17  indifference to Plaintiff's safety, in violation of the Eighth Amendment; and (4) Officer Drager

18  transferred Plaintiff to Unit C12 with deliberate indifference to Plaintiff's safety, in violation of

19  the Eighth Amendment.

20          3.      For the foregoing reasons, the instant case is REFERRED to Judge Vadas pursuant

21  to the Pro Se Prisoner Settlement Program for settlement proceedings on the remaining four

22  claims in this action, as described above.  The proceedings shall take place within ninety (90) days

23  of the filing date of this order.  Judge Vadas shall coordinate a time and date for a settlement

24  conference with all interested parties or their representatives and, within ten (10) days after the

25  conclusion of the settlement proceedings, file with the court a report regarding the prisoner

26  settlement proceedings.

27          The Clerk shall send Magistrate Judge Vadas a copy of this order.

28          4.      Other than the settlement proceedings ordered herein, and any matters Magistrate

United States District Court
Northern District of California

1   Judge Vadas deems necessary to conduct such proceedings, this action is hereby STAYED until

2   further order by the Court following the resolution of the settlement proceedings.  The Clerk shall

3   ADMINISTRATIVELY CLOSE this case until further order of the Court.

4        This order terminates Docket No. 22.

5        **IT IS SO ORDERED.**

6   Dated:  6/15/2016

7

8   HAYWOOD S. GILLIAM, JR.
    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31